IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


WILLIAM N. BASKIN                    )
      Plaintiff                    )
                           )
v.                                   )          No. 3:11-0948
                           )
CAROLYN W. COLVIN,                   )
      Acting Commissioner of           )
      Social Security[1]               )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as

provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is not supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

for judgment on the administrative record (Docket Entry No. 15) should be GRANTED to the extent that the case should be remanded as provided herein.

# I. INTRODUCTION

On June 12, 2008, the plaintiff protectively filed applications for SSI and DIB, alleging a disability onset date of April 14, 2006. (Tr. 16, 127-37.) His claim was denied initially and upon reconsideration. (Tr. 16, 61-67, 73-76.) A hearing was held before Administrative Law Judge ("ALJ") William B. Churchill on June 2, 2010 (tr. 29-56), and the plaintiff amended his alleged disability onset date to April 13, 2009, at the hearing. (Tr. 16, 32). On July 26, 2010, the ALJ issued an unfavorable decision. (Tr. 16-24.) On August 5, 2011, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.)

# II. BACKGROUND

The plaintiff was born on August 31, 1979 (tr. 129, 134), and he was thirty years old at the time of the hearing. He is married, has a tenth grade education, and has previously worked as a plumber's helper and as a forklift operator. (Tr. 33-35.)

## A. Chronological Background: Procedural Developments and Medical Records

The plaintiff presented to Volunteer Behavioral Health Care System ("Volunteer") in Lebanon, Tennessee, on March 23, 2007, for alcohol and drug assessment, depression, and sleep disturbance. (Tr. 290.) He reported using opiates "heavily" for about twelve years and having suicidal thoughts in the past. *Id.* He also reported being "in an altercation in which he was hit with

a baseball bat" and that this incident had "been bothering [him] every single day." *Id.* A mental status examination showed that the plaintiff's appearance was casual, his speech normal, and he had no problem with orientation. (Tr. 292.) His affect and behavior were appropriate; however, he was anxious, agitated, and depressed, and he exhibited evidence of delusions and hallucinations. *Id.* His memory was good, concentration fair, insight level fair, and insight rating poor. *Id.* His judgment level was limited, and his judgment rating was poor. (Tr. 293.) His impulse level was impaired, and his impulse rating was poor. *Id.* He was assessed to be a moderate suicide risk. *Id.* He was diagnosed with "polysubstance dependence; bipolar I disorder, most recent episode depressed with psychotic features; posttraumatic stress disorder, chronic;" and borderline hypertension, and he was prescribed Tegretol.[2] *Id.* He was assigned a GAF score of 56.[3] *Id.*

The plaintiff began seeing Dr. Wayne Swilley in Goodlettsville, Tennessee, for addiction treatment on April 2, 2007, and reported that he had taken Oxycontin, morphine, and Percocet for the past thirteen years.[4] (Tr. 336-37.) The plaintiff reported that he had been "clean" for fifteen days. (Tr. 336.) Dr. Swilley prescribed Suboxone.[5] *Id.* The plaintiff regularly visited Dr. Swilley for

---

[2] Tegretol is an "iminostilbene anticonvulsant; analgesic for trigeminal neuralgia; also used for restless legs syndrome (RLS), alcohol withdrawal, and post-herpetic neuralgia." Saunders Pharmaceutical Word Book 688 (2009) ("Saunders").

[3] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM–IV–TR"). A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

[4] Oxycontin, morphine, and Percocet are narcotic analgesics. Saunders at 465, 524, 546.

[5] Suboxone is a "narcotic agonist-antagonist analgesic for outpatient maintenance of opiate dependence." Saunders at 665.

addiction treatment from April 2007, through May 20, 2010.[6] (Tr. 335-72, 546-95.) During this time, the plaintiff reported feeling anxious and depressed and not sleeping well. (Tr. 335, 339, 356, 364.) The plaintiff reported occasional relapses with Lortab and morphine to Dr. Swilley and to his mental health care providers at Volunteer. (Tr. 346, 356, 359, 491, 493, 580.) He also reported various maladies including left wrist pain (tr. 348, 359); sore throat, congestion, and coughing (tr. 349, 557, 573, 577, 581); and back pain (tr. 350, 354). Dr. Swilley treated these minor medical issues and prescribed the anti-hypertensive atenolol to treat the plaintiff's high-blood pressure. (Tr. 547-48.)

On September 24, 2007, the plaintiff returned to Volunteer for a followup. (Tr. 295.) He reported that he had not slept in three days due to "racing thoughts" and that he had a depressed mood, flashbacks, nightmares, occasional irritability and crying spells. *Id.* He also reported that he had stopped taking Tegretol two months earlier because it had not helped. *Id.* He was diagnosed with polysubstance dependence, "bipolar I disorder, most recent episode depressed, severe with psychotic features," chronic posttraumatic stress disorder, and borderline hypertension. (Tr. 296.) He was assigned a GAF score of 52. *Id.* He was referred to therapy and prescribed trazodone and valproic acid.[7] *Id.* His prescribed dosage of trazodone was increased at his request on October 10, 2007.

---

[6] The Court made every attempt to decipher the medical evidence of record; however, significant portions of Dr. Swilley's handwritten treatment notes were illegible.

[7] Trazodone is a "triazolopyridine antidepressant; serotonin uptake inhibitor; also used for aggressive behavior, alcoholism, panic disorder, agoraphobia, and cocaine withdrawal." Valproic acid is an "anticonvulsant for complex partial seizures and simple or complex absence seizures." Saunders at 716, 746.

(Tr. 502.) On December 11, 2007, the plaintiff reported that trazodone was not working for him, and he was prescribed Seroquel.[8] (Tr. 487.)

The plaintiff returned to Volunteer for a followup on February 26, 2008, indicating that he experienced paranoia, mood swings, and anxiety. (Tr. 297, 467.) He reported that his medications were "somewhat beneficial" and that Trazodone had helped him sleep better but that he still had some sleepless nights. *Id.* He was advised to continue therapy and start taking valproic acid, his dosage of trazodone was increased, and he was also prescribed Haldol.[9] (Tr. 298.)

On a Tennessee Clinically Related Group ("CRG") assessment completed by Volunteer staff on March 26, 2008, the plaintiff was rated as having moderate difficulties with interpersonal functioning; adaptation to change; and concentration, task performance, and pace due to reported anxiety. (Tr. 460-462.) He returned to Volunteer for a followup on June 19, 2008, at which time he reported that he had not slept in four days. (Tr. 299, 448.) He reported "poor sleeep [*sic*] continuity/severe insomnia, anhedonia, reduced appetite, energy, concentration and motivation" as well as "sever [*sic*] anxiety, irrational fears, difficulty controlling affect, agitation, racing thoughts and anger." *Id.* He was alert and oriented, cooperative, denied suicidal thoughts, hopelessness or inappropriate guilt, and did not demonstrate delusions or hallucinations. *Id.*

On August 1, 2008, the plaintiff visited Volunteer, reporting that he had not slept in four days, was out of trazodone, and had stopped taking Haldol because it had not helped him sleep. (Tr. 439.) He was irritable and bouncing his knee, his concentration was impaired, and his mood was

---

[8] Seroquel is an "antipsychotic for schizophrenia and both manic and depressive episodes of a bipolar disorder." Saunders at 639.

[9] Haldol is an antipsychotic and antispasmodic/antidyskinetic used to treat Tourette's syndrome. Saunders at 333.

described as "expansive." *Id.* He was instructed to take his medication as prescribed; however, he was taken off of trazodone, Haldol, and Seroquel, and prescribed Geodon.[10] (Tr. 440.) The plaintiff returned for a followup on August 13, 2008, reporting that he had been suicidal for the past week. (Tr. 437.) He reported that he had stopped taking his medication, had not been sleeping, and had been hallucinating. *Id.* The plaintiff had tics and rocked in his seat. *Id.* He was taken off Geodon and started back on Seroquel. (Tr. 438.)

On September 16, 2008, Dr. Frank D. Kupstas, a nonexamining consultative DDS psychologist, completed a Psychiatric Review Technique and determined that the plaintiff had bipolar affective disorder, PTSD, and substance addiction disorder. (Tr. 381-390.) Dr. Kupstas rated the plaintiff as mildly limited in the activities of daily living and maintaining social functioning and moderately limited in maintaining concentration, persistence, or pace. (Tr. 391.) Dr. Kupstas also completed a Mental Residual Functional Capacity ("RFC") assessment on September 16, 2008. (Tr. 377-79.) Dr. Kupstas opined that the plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods of time and in his ability to perform activities with a schedule, maintain regular attendance, and be punctual. (Tr. 377-379.) Dr. Kupstas elaborated that the plaintiff was "able to sustain CPP[11] over extended periods for simple tasks, detailed [with] some difficulty at times, but still can do so." (Tr. 379.) Dr. Kupstas found no other significant limitations. (Tr. 377-79.) Dr. Andrew Phay, a nonexamining consultative DDS psychologist, "affirmed"

_____

[10] Geodon is an "antipsychotic for schizophrenia and manic episodes of a bipolar disorder." Saunders at 318.

[11] The Court assumes that "CPP" refers to concentration, persistence, and pace.

6

Dr. Kupstas' RFC on December 18, 2008, after the plaintiff reported no new allegations, treatment, or worsening. (Tr. 395.)

On September 24, 2008, the plaintiff reported to Volunteer that his mood had stabilized and that he was not as angry or irritable as before. (Tr. 431.) The plaintiff demonstrated "vocal and facial tics constantly" and rocked "throughout" the visit. *Id.* His concentration, insight, and judgment were unimpaired, he denied suicidal or homicidal ideation or psychotic symptoms, and his speech was normal. *Id.* The September 24, 2008, progress note included the same diagnoses provided a year earlier and also included Tourette's disorder. (Tr. 432.)

The plaintiff presented to Volunteer on January 7, 2009, for an "extension of medication." (Tr. 426.) He reported that his depression was a 7 on a scale of 1-10 and that he had not slept in four days after running out of medication. *Id.* He returned to Volunteer on January 19, 2009, reporting that he was not sleeping well and was having some depression, irritability, and racing thoughts. (Tr. 424.) He reported that he lost his job because his company went out of business and that he was having trouble finding employment. *Id.* He continued to demonstrate "phonic and muscular tics" and "rock[ed] continuously." *Id.* A mental status exam revealed that he was alert and oriented, with unimpaired concentration, normal speech, and unimpaired insight and judgment. *Id.* His mood was described as anxious and depressed, and he was assessed a GAF score of 52. (Tr. 424-25.) His dosage of Seroquel was increased, and he was prescribed prazosin for his tics and Remeron for depression and anxiety. (Tr. 425.)

On a CRG assessment completed by Volunteer staff on January 19, 2009, the plaintiff was rated as having mild problems with interpersonal functioning due to irritability; moderate difficulties with concentration, task performance, and pace due to hallucinations and memory problems; and

moderate difficulties adapting to change as evidenced by exacerbations of his symptoms due to noncompliance with medication. (Tr. 421-23.) The plaintiff was also classified as "[f]ormerly [s]everely [i]mpaired."[12] (Tr. 423.)

On April 13, 2009, the plaintiff reported to Volunteer that he was not sleeping well, his mind raced "all the time," and he was irritable and depressed. (Tr. 415.) He was described as mildly depressed, with minimal tics and unimpaired concentration. *Id.* He had stopped taking prazosin and Remeron after finding them unhelpful. *Id.* Instead, he was prescribed lithium for mood stabilization and Ativan for his tics. (Tr. 416.) The plaintiff returned to Volunteer on June 15, 2009, reporting that he had not taken the lithium "because the potential for toxicity scared him." (Tr. 411.) He said that he was sleeping well and described having anxiety and "ruminating thoughts." *Id.* His tics were present in "only moderate intensity," and he was assigned a GAF score of 60. (Tr. 411-12.)

The plaintiff returned to Volunteer on August 24, 2009. (Tr. 408-09.) He reported that Celexa had been "helpful to reduce his tics and anxiety" and that his sleep and appetite had been "good." (Tr. 408.) However, he also reported that, over "the last few days, his tics have been worse" and that he continued to have irritability, mild depression, and racing thoughts that interfered with his ability to concentrate. *Id.* He was prescribed Seroquel, Ativan, Celexa, and Neurontin.[13] (Tr. 409.)

On December 28, 2009, the plaintiff returned to Volunteer for an "extension of medication." (Tr. 405.) He reported that he had been out of medication for three days and was having difficulty

---

[12] The CRG assessment defined "[f]ormerly [s]everely [i]mpaired" persons as "[p]ersons [who] . . . are not recently severely impaired . . . but have been severely impaired in the past . . . and need services to prevent relapse." (Tr. 423.)

[13] Neurontin is an anticonvulsant. Celexa is a "selective serotonin reuptake inhibitor (SSRI) for major depression" that is also used to treat obsessive compulsive disorder, generalized anxiety disorder, premenstrual dysphoric disorder, and PTSD. Saunders at 141-42, 488.

sleeping without medication. *Id.* He denied having depression that day, but he reported being occasionally depressed. *Id.* He denied suicidal ideation and reported that his current medications had been helpful. *Id.* His current GAF score was 60. (Tr. 406.) He was prescribed lorazepam, Celexa, gabapentin, and Seroquel.[14] *Id.* A CRG assessment completed by Volunteer on December 28, 2009, indicated the plaintiff had mild sleep problems and irritability, moderate racing thoughts, and moderate difficulties adapting to change exacerbated by "having his home broke [*sic*] into and being out of work."[15] (Tr. 402-04.)

The plaintiff did not return to Volunteer until April 1, 2010. (Tr. 397.) He reported that "he landed in Tn Christian after he took extra [l]orazepam," adding that his tics had been "driving him crazy so he took some extra." *Id.* He indicated that he had been doing "very good" until he ran out of medication, but he requested to be taken off lorazepam. *Id.* He reported that his medication helped him sleep but that he had been out of Seroquel for three days and had not slept at all. *Id.* He demonstrated "continuous rocking, rubbing legs, and phonic tics" and was referred to a Tourette's disorder specialist. *Id.* A mental status examination showed that the plaintiff's appearance was neat and clean, he was alert and oriented, his concentration was mildly impaired, he exhibited no psychomotor retardation or agitation, and his eye contact was good. *Id.* His mood was "euthymic," his speech was normal, his insight and judgment were unimpaired, and he denied psychotic symptoms and suicidal or homicidal ideation. *Id.* His current GAF score was 60. (Tr. 398.) His

---

[14] Lorazepam and gabapentin are anticonvulsants. Saunders at 310, 415.

[15] Presumably, the reference to his house being "broke into" related to an incident described in the June 15, 2009, treatment note. (Tr. 411.)

dosage of Seroquel was increased, and he agreed to remain on lorazepam. *Id.* Additionally, he was prescribed Ativan, Celexa, and Neurontin. *Id.*

### B. Hearing Testimony

At the hearing, the plaintiff was represented by counsel, and the plaintiff and Calvin Turner, a vocational expert ("VE"), testified. (Tr. 29-56.) The plaintiff testified that he was thirty years old, has a tenth grade education, and has not obtained a GED. (Tr. 33-34.) He is married and has a ten year old son. (Tr. 34.) He has a valid driver's license and drives himself. *Id.*

The plaintiff previously worked as a forklift operator and as a plumber's helper for his father-in-law. (Tr. 35.) He testified that he stopped working in 2009 because his Tourette's disorder tics had gotten worse, people stared at him "constantly," and his "mind races a hundred miles an hour constantly." *Id.* The plaintiff testified that his Tourette's medication helped relieve his symptoms "a little bit," and he acknowledged that he had not seen a Tourette's specialist as recommended. (Tr. 36, 45.) He said that it is "very hard" for him to handle people who do not understand Tourette's disorder because they stare at him and it makes him "mad" and depressed. (Tr. 41.) He testified that he tried to do temporary work, but he had to work with lots of people and could not "handle it." (Tr. 47.) He said that his father-in-law understood his tics and was "a big part of [his] success" as a plumber's helper. (Tr. 35, 45-46.)

The plaintiff relayed that he had been beaten up by someone with a baseball bat three years prior and that, since then, his tics had gotten worse. (Tr. 38.) He said that he thought about that event "constantly." (Tr. 45.) The plaintiff testified that he had been seeing a mental health professional for the past two-and-a-half to three years. (Tr. 36.) The plaintiff acknowledged that he previously used

drugs heavily but said that he went to rehab "to get off of them." (Tr. 42.) The plaintiff testified that he smokes cigarettes and "relapsed on [m]arijuana," but denied drinking alcohol or using cocaine. (Tr. 39.) He said that he had not used cocaine in the last three years. *Id.* He said that he had overdosed in the past in an attempt to commit suicide and, a month before the hearing, had again attempted to overdose on his "nerve medicine." (Tr. 37.) He has received counseling and medication since going to rehab. (Tr. 42.) He indicated that his doctor would adjust his medication and that such adjustments affected whether he relapsed. (Tr. 42-43.)

The plaintiff testified that, when he has a manic episode, he stays awake for three or four days at a time and begins to see and hear things that other people do not see or hear. (Tr. 37-38.) He said that his sleeping medication helps "some" but that sometimes it does not help at all. (Tr. 38.)

The plaintiff said that he takes care of his son, such as taking him to and from the bus stop. (Tr. 39.) He also mows his lawn, dresses and bathes himself, prepares meals, shops for food and clothing, and does laundry and dishes. *Id.* On days when his tics are worse, which he estimated occurs about three days per week, he does not perform these activities and his wife helps him instead. (Tr. 43-44.) He relayed that he has a problem "rocking" when sitting and occasionally stumbles when walking, but can otherwise sit, stand, and walk without difficulty. (Tr. 40.) He said that he can move large items and lift more than twenty pounds but, when he has tics, his whole body moves and jerks, making it difficult for him to manipulate fine items. (Tr. 40-41.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 52.) He classified the plaintiff's prior work as a plumber's helper as heavy, semi-skilled, with a Specific Vocational Preparation ("SVP") level of four and as a forklift operator[16] as

---

[16] The VE described this job as an "industrial truck operator." (Tr. 49.)

medium, semi-skilled with a SVP level of three.[17] (Tr. 49.) The ALJ asked the VE to consider a

hypothetical person with the plaintiff's age, education, and work experience who

> during an eight-hour workday can sit for up to six hours or stand and walk six hours.
> Assume that the person can lift fifty pounds occasionally, twenty-five pounds frequently. Can
> push or pull to those weights. Assume that the person cannot engage in any fine
> manipulation, handling, no fine handling, finger, feeling and reaching. Occasionally,
> can do gross handling, finger, feeling and reaching. No working at heights. No
> climbing of ladders. No hazardous machinery. Assume that the person can
> concentrate for extended periods of time, should have limited contact with the public
> and can perform detailed task[s].

*Id.* The VE replied that such a person could not perform the plaintiff's past relevant work

"because . . . the manipulation, the reaching, handling and fingering is constant in his other job."[18]

*Id.* The VE testified that there would be work available at the light level meeting those requirements.

*Id.* The VE identified bakery conveyor line worker and laminating machine offbearer as light,

unskilled occupations with SVP levels of two that could be performed with such an RFC. (Tr. 50-

51.) The VE also identified the job of election clerk, which he testified was a sedentary, unskilled

job, with limited contact with the public and an SVP of two. (Tr. 52.) The VE indicated that all three

jobs were available in significant numbers in the state and national economies. (Tr. 51-52.) The

plaintiff's attorney then asked the VE:

---

[17] The SVP "is defined as the amount of elapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, Dictionary of Occupational Titles 1009 (4th ed. 1991). It is measured on a scale from 1-9 on which the higher number assigned to a job, the greater the length of time that is required to be able to perform the job. *Id.* An SVP level of four requires "[o]ver 3 months up to and including 6 months" of training to perform that specific work. *Id.* An SVP level of three requires "[o]ver 1 month up to and including 3 months" of training to perform that specific work.

[18] It is unclear to which previous job the VE was referring.

Q: Okay. What about the factors of a moderate limitation in concentration, task performance, and pace? They also define it as irregular or frequent difficulty with concentration, needs prompting to complete simple tasks within time frames?

A: Well, for any type of occupation, especially the ones I have cited, they are unskilled. So, if you need prompting on every task that you're required to do, you're not going to maintain that employment. On unskilled, there's a supervisor there, but there's not gonna be a supervisor just for an individual.

(Tr. 53-54.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on July 6, 2010. (Tr. 16-24.) Based upon the record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

2.    The claimant has not engaged in substantial gainful activity since April 14, 2006, the alleged onset date, as amended (20 CFR 404.1571, *et seq.*, and 416.971, *et seq.*).[19]

***

3.    The claimant has a severe combination of impairments including: bipolar disorder, posttraumatic stress disorder, Tourette's disorder, polysubstance dependence, and borderline hypertension (20 CFR 404.1520(c) and 416.920(c)). All impairments have been considered under the standard set forth in <u>Stone v. Heckler</u>, 752 F.2d 1099 (5th Cir. 1985).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520,(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

---

[19] As noted *supra* at 2, and discussed in more detail *infra*, the plaintiff amended his alleged onset date to April 13, 2009. (Tr. 32.)

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to maintain employment at the level of lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and walking 6 hours in an 8-hour workday; sitting 6 hours in an 8-hour workday; and no fine handling, fingering, feeling, and reaching but can occasionally perform gross handling, fingering, feeling, and reaching. The claimant can never climb ladders and is to avoid unprotected heights and hazardous machinery. He can concentrate for an extended period of time but has a limited ability to interact with the public. Further, the claimant retains the ability to perform detailed tasks. 20 CFR 404.1567(b) and 416.967(b)

\*\*\*

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*\*\*

7.  The claimant was born on August 31,1979 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 14, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 18-23.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers*

*v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering

simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five-Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 18.) At step two, the ALJ determined that the plaintiff had a severe combination of impairments including bipolar disorder, PTSD, Tourette's disorder, polysubstance dependence, and borderline hypertension. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 18-19.) At step four, the ALJ determined that the plaintiff was not capable of performing his past relevant work as a plumber's helper or industrial truck operator. (Tr. 22.) At step five, the ALJ determined that the plaintiff could work as a bakery conveyor line worker, laminating machine operator, or election clerk. (Tr. 22-23.)

**C. The Plaintiff's Assertions of Error**

The plaintiff argues generally that the ALJ erred in assessing his credibility and raises a multitude of issues in support of his argument. Docket Entry No. 16, at 4-9. He also argues that the ALJ erred in determining his mental RFC. Docket Entry No. 16, at 10.

**1. The ALJ properly evaluated the plaintiff's subjective complaints of symptoms.**

The plaintiff contends that the ALJ erred in evaluating his credibility regarding his subjective complaints. Docket Entry No. 16, at 4. After reviewing the medical evidence, as well as the plaintiff's hearing testimony, the ALJ found that:

> [T]he claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment (SSR 96-7p). The finding of diminished credibility is supported by inconsistencies between the claimant's allegations and the paucity of objective medical evidence. Specifically, the claimant has a history of polysubstance dependence, bipolar disorder, [and] posttraumatic stress disorder. However, the medical evidence indicates that with prescribed medication and therapy, his symptoms improved. For example, in February of 2008, the claimant reported he was compliance [*sic*] with medications and felt they had been somewhat beneficial and denied any significant side effects. At the time, he also reported continuing to work. . . . In August 2009, the claimant [reported] the Celexa had been helpful in reducing his anxiety. His sleep and appetite was [*sic*] good. He further reported experiencing only mild depression . . . . In December of 2009, he denied any depression but stated that he was occasionally depressed. He denied any suicidal hallucinations. He reported his current medications had helped and he was working part time as a plumber. . . . The recent medical evidence indicates that the claimant was seen for a follow-up visit after being absent since December of 2009. During this particular visit, the claimant denied psychotic symptoms. . . . Moreover, the claimant has a history of polysubstance dependence which contributes to his mental symptoms. In fact, he testified that he recently relapsed on using marijuana.

The undersigned notes that the claimant has also been diagnosed with borderline hypertension. However, there is no evidence of ongoing treatment for uncontrolled blood pressure nor is there evidence of any end organ damage related to uncontrolled blood pressure. He has also been diagnosed with Tourette's disorder. However, this impairment has not caused a significant impact on his ability to perform work -related activities. At the hearing, he testified that he takes prescribed medication for Tourette's disorder, which helps.

When evaluating the claimant's credibility, the undersigned notes that during a follow-up visit on January 19, 2009, the claimant reported he had lost his job two weeks prior to the visit because the company went out of business. . . . The evidence clearly shows that the claimant

The Administrative Law Judge finds that while the evidence regarding the intensity and persistence of the claimant's symptoms is partially credible, it is not credible to the extent that it demonstrates no capability to perform work. The limitations alleged are only partially consistent with and supported by the objective medical evidence and other evidence. (SSR 96-7p) The Fifth Circuit, in *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) stated that "[p]ain constitutes a disabling condition when it is constant, unremitting, and wholly unresponsive to treatment." The undersigned accepts the claimant's allegations of pain but not to the extent that it prevents him from performing all work-related activities.

(Tr. 21-22.) (Internal citations omitted).

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff]'s complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain and other symptoms. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of symptoms must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic

standard for evaluating such claims.[20] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Hash v. Comm'r of Soc. Sec.*, 309 Fed. Appx. 981, 990 (6th Cir. Feb. 10, 2009) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Felisky*, 35 F.3d at 1039). The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)). Additionally, a plaintiff's subjective complaints are "not limited to complaints of pain resulting from physiological impairments," but may also include symptoms resulting from mental impairments. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) (citing 20 C.F.R. § 404.1529).

Initially, the plaintiff argues that the ALJ applied the wrong legal standard in evaluating his subjective complaints.[21] Docket Entry No. 16, at 9. In concluding that the plaintiff's symptoms were

---

[20] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

[21] The plaintiff also argues that the ALJ erred when evaluating the severity of his impairments by citing to *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). (Tr. 18.) Docket Entry No. 16, at 9. In *Stone*, the Fifth Circuit set forth the following standard for determining the severity of an impairment: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." 752 F.2d at 1101 (quoting *Estran v. Heckler*, 745 F.2d 340, 340-41 (5th Cir. 1984)). The plaintiff has not explained how this standard differs from the Sixth Circuit's standard, and the Court discerns no difference. *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) ("[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."). *See also Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir.

partially credible but were not credible to the extent that they precluded all work, the ALJ cited *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994), for the proposition that "[p]ain constitutes a disabling condition when it is constant, unremitting, and wholly unresponsive to treatment." (Tr. 22.) The plaintiff has not explained how this citation differs from Sixth Circuit case law. Regardless, the ALJ did not evaluate the plaintiff's subjective complaints under this "standard," but merely cited it as additional support for his conclusions. The ALJ specifically noted that he evaluated the plaintiff's symptoms under the requirements set forth in 20 C.F.R. §§404.1529, 416.929 and Social Security Rulings 96-4p and 96-7p. (Tr. 19-20.) Although the ALJ did not explicitly cite *Duncan*, the Sixth Circuit has held that "analysis under these regulations is not inconsistent with the standards . . . set forth in *Duncan*" and that "an ALJ who follows the requirements of 20 C.F.R. § 404.1529 does not commit error by failing to explicitly follow *Duncan*." *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 835 (6th Cir. 2005) (citing *Baranich v. Barnhart*, 128 Fed. Appx. 481, 483 (6th Cir. 2005); *McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995)). Accordingly, the Court concludes that the ALJ applied the correct legal standard and will review the ALJ's analysis under the *Duncan* test.

There is objective evidence of underlying medical conditions to the extent that the plaintiff has been diagnosed with bipolar disorder, PTSD, Tourette's disorder, polysubstance dependence, and borderline hypertension. (Tr. 293, 296, 300, 398, 405, 409.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must meet only one of the following two elements: the objective medical evidence confirms the severity of the alleged pain or other symptoms arising from the condition or the objectively established medical condition is of such a severity that

1985). Moreover, the plaintiff has not ascribed any fault to the ALJ in his listing of the plaintiff's impairments. Consequently, he is not entitled to relief on this ground.

it can reasonably be expected to produce the alleged disabling pain or other symptoms. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The SSA provides a checklist of factors to assess a plaintiff's symptoms in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the intensity or persistence of his symptoms simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[22]

Here, the ALJ reviewed the plaintiff's testimony that he takes medication for his medical impairments, that he has manic episodes of sleeplessness, and that he smokes and has relapsed with marijuana but does not use alcohol or cocaine. (Tr. 20.) The ALJ also reviewed the plaintiff's testimony that he takes care of his son by taking him to the bus stop and picking him up, that he mows the lawn, dresses and bathes himself, shops for food and clothing, and cooks and washes dishes. *Id.* The ALJ then summarized certain pertinent medical records, including the plaintiff's original visit to Volunteer on March 23, 2007, at which he was diagnosed with polysubstance dependence, bipolar disorder, PTSD, and borderline hypertension. *Id.* The ALJ also summarized treatment notes from August 24, 2009, December 28, 2009, and April 1, 2010, generally highlighting that the plaintiff reported mild symptoms and that his medication was helping. (Tr. 20-21.) The ALJ noted the plaintiff's reports on these occasions of difficulty sleeping, mild and occasional depression,

---

[22] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (I) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate his symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of his symptoms; (vi) any measures plaintiff uses or has used to his symptoms; and (vii) other factors concerning plaintiff's functional limitations and restrictions due to his symptoms.

racing thoughts, mild irritability, and difficulty concentrating. The ALJ also noted that the claimant was assigned a GAF score of 60 on April 1, 2010.[23] (Tr. 21.)

After summarizing the plaintiff's testimony and medical record, the ALJ concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with his RFC. (Tr. 21.)

The ALJ listed several reasons for reaching this conclusion. First, the ALJ noted that the plaintiff's symptoms improved when he complied with prescribed medication and therapy. *Id.* The ALJ noted several instances ranging from February 2008, until April 2010, when the plaintiff either reported that his medication had helped relieve his symptoms or denied having significant symptoms. *Id.*

---

[23] A GAF score is not dispositive, but can be helpful, in assessing an individual's mental RFC. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. Feb. 9, 2006) (quoting DSM-IV-TR 34 (4th ed. 2000)). *See also Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. Sept. 7, 2007); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. Dec. 15, 2006). As explained in *Kornecky*:

> GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates "[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain personal hygiene or serious suicidal act with clear expectation of death." At the high end, GAF 91-100 indicates "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms." A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.

167 Fed. Appx. at 503 n.7 (quoting DSMV-IV-TR at 34) (internal notations omitted).

The plaintiff argues that the ALJ improperly considered a medical treatment note from Volunteer on February 26, 2008, in which he reported that he had been compliant with medication and felt that it had been "somewhat beneficial" and not caused side effects. (Tr. 21.) Docket Entry No. 16, at 6. The plaintiff argues that the ALJ should not have considered this evidence because it predates his alleged onset date of April 13, 2009.[24] Docket Entry No. 16, at 6. However, a plaintiff's medical history, as well as the effectiveness and side effects of medication, are relevant factors for an ALJ to consider when assessing the intensity and persistence of a plaintiff's symptoms. *See* 20 C.F.R. § 404.1529(c)(1), (3). While the focus of the ALJ's inquiry should be on the relevant period of disability, *see Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001), the Sixth Circuit has explained that evidence "predating the onset of disability, when evaluated *in combination with later evidence*, may help establish disability." *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 414 (6th Cir. 2006). The fact that the plaintiff's symptoms were historically controlled with medication and that the medication did not cause side effects were relevant factors for the ALJ to consider. Importantly, the ALJ did not review the February 2008 note in isolation. Instead, he also cited later treatment notes from August 2009, December 2009, and April 2010, in which the plaintiff made substantially similar reports, i.e., denying major symptoms and reporting that medication helped relieve his symptoms. (Tr. 21.) The ALJ was permitted to review the plaintiff's medical

---

[24] The Court notes that, while the ALJ recorded in his decision that the plaintiff amended the alleged onset date to April 13, 2009 (tr. 16), his findings reflect the original alleged onset date of April 14, 2006. (Tr. 18, 22-23.) Thus, it is unclear which alleged onset date the ALJ used in his decision. The general rule appears to be that, absent a showing of prejudice, "an error in the alleged onset of disability is not itself a basis for remand." *Ehrob v. Comm'r of Soc. Sec.*, 2011 WL 977514, at *6 (E.D. Mich. March 17, 2011). The plaintiff did not address this discrepancy in his brief or argue any specific prejudice arising from the alleged onset date used by the ALJ.

history in this manner, and the Court finds no error in the ALJ's citation to the February 2008 treatment note.

The plaintiff also argues that the ALJ misstated the medical evidence when he cited a treatment note from Volunteer on August 24, 2009. Docket Entry No. 16, at 6-7. The ALJ noted that, on that date, the plaintiff reported "Celexa had been helpful in reducing his anxiety. His sleep and appetite was good. He further reported experiencing only mild depression." (Tr. 21.) The plaintiff argues that the ALJ failed to consider the whole record, pointing out that the plaintiff also reported to Volunteer that "the last few days, his tics ha[d] been worse," that "they are worse when [he] has more stress" and that he was "[h]aving some irritability, mild depression, and . . . racing thoughts" that interfered with his ability to concentrate. Docket Entry No. 16, at 6-7. (Tr. 408.)

When summarizing the medical record, the ALJ discussed the August 24, 2009 treatment note in greater detail and specifically mentioned the plaintiff's reports of irritability and racing thoughts. (Tr. 20.) Additionally, the portions of the note cited by the plaintiff are not inconsistent with the portions highlighted by the ALJ. The plaintiff testified at the hearing that his tics were worse on some days than others. (Tr. 43-44.) The fact that his tics were worse in the days preceding August 24, 2009, does not contradict the plaintiff's report that Celexa had been "helpful to reduce his tics and anxiety." The ALJ was entitled to rely on this evidence in reaching his decision.

Similarly, the plaintiff argues that the ALJ failed to consider the whole record when he cited an April 1, 2010 treatment note from Volunteer and noted that the plaintiff denied having psychotic symptoms on that date. Docket Entry No. 16, at 7. (Tr. 21.) The plaintiff contends that the ALJ ignored that, on that date, he also reported that his tics had been "driving him crazy," causing him to accidently overdose on lorazepam, that he had been referred to a Tourette's specialist, and that he

demonstrated "continuous rocking, rubbing legs, and phonic tics." Docket Entry No. 16, at 7. (Tr. 397.) Here again, when reciting the plaintiff's medical history, the ALJ provided greater detail regarding the April 1, 2010, treatment note. (Tr. 20-21.) For example, the ALJ also noted that, on that date, the plaintiff was:

> seen for a follow-up visit after being absent since December of 2009. A mental status examination showed the claimant's appearance was neat and clean. He was alert and oriented x 4. His concentration was mildly impaired. He exhibited no psychomotor retardation or agitation. His eye contact was good. His mood was reported as euthymic. His speech was normal rate, rhythm, articulation, prosody, and volume. The claimant denied suicidal ideation and homicidal ideation. He denied psychotic symptoms, including auditory hallucinations and visual hallucinations. His insight and judgment were unimpaired. The claimant was diagnosed with bipolar disorder, posttraumatic stress disorder, Tourette's disorder, polysubstance dependence, and borderline hypertension. The claimant was assigned a Global Assessment of Functioning (GAF) score of 60.

*Id.* The ALJ clearly considered this treatment note in its entirety and concluded that the plaintiff's complaints were not as severe as he alleged. While the plaintiff has cited portions of the note that may weigh against the ALJ's conclusion, the note ultimately supports the ALJ's characterization. The ALJ did not err in referring to the April 1, 2010 treatment note.

As further support for his conclusion that the plaintiff's symptoms were not as severe as alleged, the ALJ noted that the plaintiff's Tourette's disorder did not create "a significant impact on his ability to perform work-related activities." The plaintiff argues that the ALJ's conclusion is contradicted by the plaintiff's testimony that he stopped working in April 2009 because his tics had gotten worse. Docket Entry No. 16, at 7-8. (Tr. 35.)

Although the plaintiff points to evidence supporting his position, there is nevertheless substantial evidence supporting the ALJ's conclusion. For example, on April 13, 2009, the plaintiff reported that he was not having tics that day, but that some days were better than others. (Tr. 415.)

On June 15, 2009, his tics were present in "only moderate intensity." (Tr. 411.) On August 24, 2009, the plaintiff reported that Celexa had been "helpful to reduce his tics and anxiety;" however, he also indicated that, in the preceding few days, his tics had been worse. (Tr. 408.) On December 28, 2009, he reported that his current medications had helped. (Tr. 405.) He did not return to Volunteer until April 1, 2010, when he reported that his tics had been "driving him crazy," leading him to take extra medication. (Tr. 397.) The plaintiff was referred to a Tourette's specialist; however, he never presented to the specialist. (Tr. 45, 397.) None of the plaintiff's doctors or mental health care providers opined that he was functionally limited by Tourette's disorder. The ALJ nevertheless included a limitation in the plaintiff's RFC for contact with the public, presumably due to the plaintiff's testimony that he could not work because people stared at him, making him uncomfortable. (Tr. 19.) The Court concludes that the ALJ did not err in reaching his conclusions regarding the plaintiff's Tourette's disorder.

As other reasons supporting his credibility determination, the ALJ noted that, while the plaintiff has a history of polysubstance dependence that contributes to his mental health symptoms, he continued to relapse. (Tr. 21.) Additionally, the ALJ noted that, although the plaintiff had been diagnosed with borderline hypertension, there was no evidence of end organ damage. *Id.* The plaintiff does not contest these findings.

The ALJ also gave "some" weight to the opinions of Dr. Kupstas and Dr. Phay, the non-examining consultative psychologists. (Tr. 22.) In his Psychiatric Review Technique, Dr. Kupstas found mild limitations in the activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 22, 381-91.) In his RFC assessment, Dr. Kupstas found that the plaintiff had moderate limitations in sustaining concentration

and persistence. (Tr. 377-79.) Dr. Phay later "affirmed" Dr. Kupstas' RFC after finding no new allegations, treatment, or worsening.[25] (Tr. 395.)

Additionally, the ALJ attempted to provide another reason for discounting the plaintiff's credibility. However, he apparently omitted a portion of his analysis:

> When evaluating the claimant's credibility, the undersigned notes that during a follow-up visit on January 19, 2009, the claimant reported he had lost his job two weeks prior to the visit because the company went out of business. . . . The evidence clearly shows that the claimant

(Tr. 21.) Without finishing this sentence, the ALJ moved on to his conclusion that the plaintiff's complaints were only partially credible. The plaintiff argues that ALJ's omission is an "obvious error" entitling him to remand. Docket Entry No. 16, at 9. The Commissioner urges the Court to infer the ALJ's reasoning to be that the "plaintiff's inability to work was not based on an impairment and his allegations of disability [were] not persuasive to the extent alleged." Docket Entry No. 17, at 17.

The ALJ's error here appears to be clerical in nature. He failed to complete a sentence. The question is whether that error requires remand or whether it is harmless. When an ALJ finds that a plaintiff's complaints are not credible, he is required to "clearly state his reasons for doing so." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). As to this specific reason, the ALJ obviously did not clearly state his rationale, and the Court declines to infer the ALJ's rationale. However, the Court must review the record as a whole. *Berry v. Comm'r of Soc. Sec.*, 289 Fed. Appx. 54, 55-56 (6th Cir. Aug. 8, 2008). The ALJ provided several other reasons for discounting the plaintiff's subjective complaints. Omitting the flawed reason entirely, the ALJ nevertheless provided sufficient

---

[25] The Court addresses the ALJ's reliance on the opinions of the DDS consultants in more detail below.

additional reasons for his decision. The Court thus concludes that the ALJ's clerical error was harmless.

In sum, there is substantial evidence in the record to support the ALJ's finding that the plaintiff's alleged symptoms limited but did not preclude him from all work. The ALJ appropriately considered several of the factors outlined in 20 C.F.R. § 404.1529(c)(3), including the plaintiff's daily activities, the frequency and intensity of his symptoms, the effectiveness and side effects of medication, and precipitating and aggravating factors such as running out of medication and substance abuse.[26] The ALJ then sufficiently stated his reasons for discounting the plaintiff's credibility. In his memorandum, the plaintiff parses each statement made by the ALJ and disputes the ALJ's reasons in isolation from one another. However, when viewed as a whole, the ALJ's decision provides sufficient reasons to support his credibility finding. Although the ALJ made a clerical error in stating one of his reasons, that error is harmless because the ALJ provided several other sufficient reasons. Therefore, the Court concludes that the ALJ's conclusion regarding the plaintiff's subjective complaints is supported by substantial evidence in the record.

### 2. The ALJ erred in formulating the plaintiff's RFC.

The plaintiff next argues that the ALJ did not give good reasons for finding that he could perform detailed tasks and concentrate for extended periods of time and that such conclusions are contrary to the evidence. Docket Entry No. 16, at 10. (Tr. 19.) The Commissioner's argument on this

---

[26] The plaintiff argues that the ALJ's diminished credibility finding was based "solely" on the lack of objective medical evidence. Docket Entry No. 16, at 5-6 (citing 20 C.F.R. § 404.1529 and Soc. Sec. Rul. 96-7p). However, as discussed in detail above, while the ALJ did find support for his credibility finding in the "paucity of objective medical evidence" (tr. 21), he did not base his decision solely on this factor but also considered several of the appropriate factors in section 404.1529(c).

issue is hard to discern, but it appears to be that the plaintiff's limitations in these areas were not significant enough to warrant inclusion in his RFC. Docket Entry No. 17, at 17-19.

A CRG assessment completed by Volunteer staff on December 28, 2009, rated the plaintiff as having moderate difficulty with concentration, performance, and pace due to "racing thoughts."[27] (Tr. 402-404.) Likewise, in his Psychiatric Review Technique, Dr. Kupstas opined that the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 391.) Additionally, in the summary portion of his mental RFC assessment, Dr. Kupstas indicated that the plaintiff was moderately limited in two areas pertaining to sustained concentration and pace: (1) the ability to maintain attention and concentration for extended periods; and (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 377.) Somewhat confusingly, Dr. Kupstas explained, in the functional capacity assessment portion of his RFC, that the plaintiff was "able to sustain CPP over extended periods for simple tasks, detailed [with] some difficulty at times, but still can do so." (Tr. 379.) Dr. Kupstas' assessment was later "affirmed" by Dr. Phay. (Tr. 395.)

The ALJ's hypothetical question asked the VE to consider a person who could concentrate for extended periods of time and perform detailed tasks. (Tr. 49.) Upon questioning by the plaintiff's attorney, the VE indicated that if someone had moderate limitations in the areas of concentration, task performance, and pace, then the jobs the VE identified would be unavailable to that person. (Tr. 53-54.) In the ALJ's final decision, the plaintiff's RFC reflected that he was able to concentrate for extended periods of time and perform detailed tasks. (Tr. 20.)

---

[27] Earlier CRG assessments completed by Volunteer staff rated the plaintiff as having moderate limitations in the same areas due to hallucinations, memory problems, and reported anxiety. (Tr. 422, 461.)

The ALJ was not required to include limitations in his hypothetical question that were not supported by the record or not credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). However, in order for the VE's testimony in response to a hypothetical question to serve as substantial support for the conclusion that the plaintiff can perform other work, the hypothetical must accurately portray the plaintiff's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. Feb. 5, 2010).

The record on this issue is sparse. The CRG assessments completed by Volunteer staff reflect moderate limitations. However, the ALJ did not address these assessments in his decision. Additionally, while Dr. Kupstas found that the plaintiff had moderate limitations in maintaining attention and concentration for extended periods, he modified those limitations somewhat by noting that the plaintiff could maintain concentration, persistence, or pace over extended periods for simple tasks but had more difficulty with detailed tasks. The ALJ's decision, however, did not address these aspects of Dr. Kupstas' opinions. The RFC that the ALJ provided for the plaintiff merely concluded that the plaintiff has an unlimited ability to concentrate for extended periods of time and perform detailed tasks without addressing countervailing evidence or providing further explanation. Compounding matters, while the ALJ gave "some weight" to the opinions of the DDS physicians (tr. 22), he did not explain which portions of their opinions he credited and which portions he discounted or the reasons for the weight given. The ALJ's discussion of the weight he afforded the state medical sources is completely lacking in specificity or analysis. *See Gayheart v. Comm'r of*

*Soc. Sec.*, __F.3d __, 2013 WL 896255, at *13 (6th Cir. Mar. 12, 2013) (noting that an ALJ should rigorously scrutinize the opinions of nontreating and nonexamining sources).

The Court is thus limited in its review due to the ALJ's failure to adequately articulate the weight that he gave the state medical sources. If the ALJ accepted the opinions of the state medical sources that the plaintiff had moderate limitations in the areas of concentration, persistence, and pace, and particular difficulties performing detailed tasks, then he should have incorporated those limitations into his hypothetical question and RFC. Otherwise, the ALJ's hypothetical question to the VE and RFC do not accurately reflect the plaintiff's impairments. *See Ealy*, 594 F.3d at 516. On the other hand, if the ALJ concluded that the limitations found by the state medical sources were not fully credible or supported by the record, then he should have clearly explained his reasons for so determining. As the decision stands, the Court cannot discern why the ALJ concluded that the plaintiff did not suffer any limitations regarding concentration or the ability to perform detailed tasks when the state medical sources, to whom the ALJ gave some weight, determined that he did suffer such limitations. Consequently, the Court cannot determine whether substantial evidence supports the ALJ's decision.

Accordingly, the Court recommends that the case be remanded. On remand, the ALJ should clarify and explain in greater detail the weight that he gives the state medical sources. Further, he should consider and explain whether he finds support for the specific limitations identified by the state medical sources. To the extent that the ALJ finds these limitations supported by the record, he should incorporate them into the plaintiff's RFC assessment.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 15) be GRANTED to the extent that the case should be REMANDED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully submitted,


_____
JULIET GRIFFIN
United States Magistrate Judge